Raphael GREGORIAN; California International Trade Corporation, Plaintiffs–Appellees,

v.

IZVESTIA; Ministry of Foreign Trade of the Union of Soviet Socialist Republics; V/O Licensintorg, Defendants,

and

V/O Medexport, Defendant–Appellant.

Raphael GREGORIAN and California International Trade Corporation, Plaintiffs–Appellants,

v.

IZVESTIA; Ministry of Foreign Trade of the Union of Soviet Socialist Republics; V/O Medexport, Defendants–Appellees,

and

Union of Soviet Socialist Republics; V/O Licensintorg, Defendants.

Nos. 87–5903, 88–5562.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 6, 1988.

Decided April 12, 1989.

John Mage, Wolf, Popper, Ross & Wolf & Jones, New York City, for defendant-appellant/cross-appellee.

Gerald L. Kroll, Kroll & Firestone, Los Angeles, Cal., for the plaintiffs-appellees/cross-appellants.

Douglas Letter, Dept. of Justice, Washington, D.C., for the amicus U.S.

Before PREGERSON, REINHARDT and NOONAN, Circuit Judges.

PREGERSON, Circuit Judge:

The two appeals in this case stem from a suit brought by plaintiffs Raphael Gregorian and his firm, California International Trade Corporation (CIT), against defendants U.S.S.R., the Soviet newspaper *Izvestia*, two Soviet foreign trading organizations, V/O Medexport and V/O Licensintorg, and the Ministry of Foreign Trade of the U.S.S.R.[1] In their complaint plaintiffs alleged that defendants had damaged plaintiffs' reputations and harmed them financially by causing CIT's "accreditation" by the Ministry of Foreign Trade to be revoked and by causing to be published an article in *Izvestia* that libeled plaintiffs. Plaintiffs alleged that defendants engaged in this conduct to avoid contractual obligations to plaintiffs resulting from alleged promises to pay for medical equipment transported to the Soviet Union by plaintiffs. Plaintiffs also alleged that defendants had breached these contractual obligations by failing to pay for this equipment. When, following instructions from their government, defendants did not appear, default judgments on both the libel and contract claims were entered against them. After plaintiffs attempted to execute on their judgment by levying on defendants' property, V/O Medexport and V/O Licensintorg appeared and requested that the default judgments be set aside. The district court set aside the default judgment on the libel claim, but denied the motion to set aside the default judgment on the contract claims. *Gregorian v. Izvestia*, 658 F.Supp. 1224 (C.D.Cal.1987).

Plaintiffs have appealed the court's order setting aside the libel default judgment; defendant V/O Medexport has appealed the

---

1. Plaintiffs originally brought suit against four American defendants—Mine Safety Appliance Company; Catalyst Research; J. Wesley Kulp; and Alan A. Schneider, Ph.D.—in addition to the Soviet defendants. The American defendants are not parties to these appeals.

denial of its motion to set aside the contract default judgment.

These two appeals present the following questions. First, was the district court's Rule 54(b) certification of its order dismissing plaintiffs' libel claim proper? Second, did the district court correctly conclude that the Foreign Sovereign Immunities Act, 28 U.S.C. sections 1602 *et seq.* (1976), did not confer jurisdiction over plaintiffs' libel claim? Third, did the district court err in denying defendants' motions to vacate the default judgment on plaintiffs' contract claims?

## BACKGROUND

Beginning in 1970, Raphael Gregorian, a United States citizen, and his firm, California International Trade Corporation (CIT), engaged in the business of exporting medical and laboratory goods to the U.S.S.R. In 1982, the Soviet Ministry of Foreign Trade awarded "accreditation" to CIT. This enabled CIT to employ Soviet personnel and to maintain an office in Moscow with telephone and telex equipment. The accreditation evidently provided CIT significant business advantages, including increased credibility with United States manufacturers of medical and laboratory equipment.

Plaintiffs allege that they arranged to sell three sets of equipment to the Soviets: the "Technicon" equipment, in 1982; the "Mennen" equipment, in 1984; and the "Sarns" equipment, in 1984. Plaintiffs allege that CIT shipped all the items to the Soviet Union at or about the time of their alleged purchase by the Soviets, and that the equipment was in use in Soviet hospitals in 1984. According to plaintiffs, defendants Ministry of Foreign Trade, the U.S.S.R., and V/O Medexport and V/O Licensintorg (Soviet foreign trading organizations) were CIT's "customers," i.e., they had entered into oral contracts with CIT regarding the above-mentioned equipment.

Plaintiffs allege that defendants have never paid for any of this equipment, in violation of their contractual commitments. Defendants disclaim any such contractual arrangements.

On November 10, 1984, the Ministry of Foreign Trade stripped CIT of its accreditation to maintain a business office in the U.S.S.R. On November 18, 1984, the Soviet newspaper *Izvestia* printed an article [2] entitled "Duplicitous Negotiator: A Story About a U.S. Firm and an Abuse of Trust." The article accused Gregorian of engaging in smuggling, bribery, and unethical business practices; it also intimated that he had been spying for the United States. 658 F.Supp. at 1226. According to plaintiffs, this article demolished the business reputation of CIT, causing it to lose valuable business contacts and reducing it to "a narrow, windowless basement office in Mr. Gregorian's home." Opening Brief on Behalf of Appellants, at 5.

Plaintiffs brought suit against the Soviet defendants in United States District Court in January of 1985, alleging, *inter alia,* breach of contract, libel, and civil conspiracy. Plaintiffs basically alleged that the Soviet defendants had stripped CIT of its accreditation and published the article in *Izvestia* to avoid their contractual obligations to pay for the equipment which CIT had shipped to the U.S.S.R.

Service of process was made on the Soviet defendants through the United States Department of State pursuant to 28 U.S.C. section 1608(a). On May 31, 1985, the United States Embassy in Moscow transmitted the summons and complaint and enclosed copies of each to the Soviet defendants with a note advising them of the Foreign Sovereign Immunities Act (FSIA), 28 U.S. C. §§ 1602 *et seq.* The note also informed defendants that under United States law a defendant must file an answer to the complaint within sixty days or risk default.

---

**2.** Defendants do not concede the accuracy of plaintiffs' translation of this article. Defendants, however, have not provided an alternative translation; they state that because plaintiffs' translation "was the basis for the district court's rulings it [is] … taken as if it were accurate for the purposes of this appeal." Answering Brief of Cross–Appellees V/O Medexport and V/O Licensintorg, at 42 n. 21.

At the direction of their government, the defendants rejected service and the district court entered their default on July 31, 1985. The court then ordered entry of default judgment on four of the contract claims and the one libel claim, eventually awarding damages of $163,165 on the contract claims and $250,000 on the libel claim.

After plaintiffs obtained an order giving them the right to attach and execute against defendants' property in the United States, they seized a Cyrillic typewriter belonging to a U.S. correspondent for *Izvestia.* Soon afterwards they obtained another order permitting them to execute against funds held under the name of the Bank for Foreign Trade, U.S.S.R., "for the benefit of V/O Medexport." One day later, on November 21, 1986, American counsel filed a notice of entry of appearance on behalf of V/O Medexport and V/O Licensintorg. V/O Medexport and V/O Licensintorg filed motions to set aside the default judgments, stay execution, and dismiss the case.

The appearance of the two Soviet defendants followed lengthy negotiations with the U.S. State Department, which urged the Soviets to appear. The United States as *amicus curiae* then supported defendants' motion to set aside the default judgments so that the Soviets' defenses could be considered on the merits.

On April 5, 1987 the district court granted defendants' motion to set aside the default judgment on the libel claim on the ground that it had lacked subject matter jurisdiction under the FSIA, 28 U.S.C. § 1605, to enter the judgment. 658 F.Supp. at 1234. The court however denied defendant V/O Medexport's motion to set aside the default judgment on the contract claims, holding that defendants had not demonstrated that they were entitled to relief from judgment under Fed.R.Civ.P. 60(b)(4) and (6). *Id.* at 1236, 1239.

## DISCUSSION

### I. LIBEL CLAIM

Plaintiffs contend that the Soviet trading organizations V/O Medexport and V/O Li-

censintorg attempted to avoid their alleged contractual commitments to CIT by "causing to be published" libelous statements in *Izvestia,* the newspaper published by the Soviet government. Answering and Reply Brief on Behalf of Appellants, at 25. Plaintiffs believe that the district court erred in setting aside the default judgment on the libel claim on the basis of lack of subject matter jurisdiction. Defendants argue that the issue is not properly before this court because of an improper Rule 54(b) certification; that the FSIA does not provide jurisdiction over such a claim but rather confers immunity from the claim on defendants; and that the act of state doctrine bars adjudication of the libel claim. Because we conclude that the issue was properly certified under Rule 54(b) of the Federal Rules of Civil Procedure, and that the FSIA does not provide subject matter jurisdiction over the libel claim, there is no need for us to rule on the applicability of the act of state doctrine.

### A. Rule 54(b) Certification

On December 18, 1987 the district court granted plaintiffs' request for a Rule 54(b) certification of the order dismissing the libel claim. C.R. 180.[3] This permitted plaintiffs to appeal the dismissal of their libel claim. Defendants argue that the Rule 54(b) certification represented an abuse of discretion by the district court, and that the appeal is therefore improperly before this court. Defendants' position lacks merit.

Rule 54(b) provides that:

When more than one claim for relief is presented in an action ... the court may direct the entry of a final judgment as to one or more but fewer than all the claims ... only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any other order or form of decision, however designated, which adjudicates fewer than all

---

**3.** "C.R." refers to the Clerk's Record; the num-  ber following identifies the document.

the claims ... shall not terminate the action as to any of the claims ..., and the order or other form of decision is not subject to revision at any time before the entry of judgment adjudicating all the claims....

Fed.R.Civ.P. 54(b).

Defendants argue that two of plaintiffs' claims, which are still pending in the district court, are "identical" to plaintiffs' libel claim. Therefore, defendants argue, it was error for the district court to grant a Rule 54(b) certification of the libel claim, because, under *Frank Briscoe Co., Inc. v. Morrison–Knudsen Co.*, 776 F.2d 1414, 1416 (9th Cir.1985), "[a] similarity of legal or factual issues [still pending before the trial court] will weigh heavily against entry of judgment under the rule, and in such cases a Rule 54(b) order will be proper only where necessary to avoid a harsh and unjust result, documented by further and specific findings." In *Frank Briscoe*, the court held that the district court's Rule 54(b) certification of its order dismissing plaintiff's negligence claim was not valid because the district court's order had not disposed of a pending (conspiracy) claim, and because the district court had not made a requisite "express determination that there is no just reason for delay." *Id.* (citing Fed.R.Civ.P. 54(b)).

Here, the district court, in its order granting the Rule 54(b) certification, expressly stated that it found "no just reason for delaying the entry of judgment" on its order dismissing the libel claim, and that "the adjudicated and unadjudicated claims are based upon substantially different factual and legal issues." C.R. 180 at 2.

In *Curtiss–Wright Corp. v. General Electric Co.*, 446 U.S. 1, 10, 100 S.Ct. 1460, 1466, 64 L.Ed.2d 1 (1980), the Supreme Court articulated the standard of review for Rule 54(b) certifications. The Court stated:

The court of appeals must ... scrutinize the district court's evaluation of such factors as the interrelationship of the claims so as to prevent piecemeal appeals in cases which should be reviewed only as single units. But once such judicial concerns have been met, the discretionary judgment of the district court should be given substantial deference.... The reviewing court should disturb the trial court's assessment of the equities only if it can say that the judge's conclusion was clearly unreasonable.

*Id.*

Thus *Curtiss–Wright* requires two enquiries. The first, consisting of scrutiny of the district court's evaluation of factors such as the interrelationship of the claims, presents a mixed question of law and fact which we generally review de novo. *See United States v. McConney*, 728 F.2d 1195, 1200–04 (9th Cir.1984) (en banc). The second, an assessment of basically equitable concerns, is made only after the "judicial concerns" of the first step are satisfied. In the second step, we review "the trial court's assessment of the equities" for abuse of discretion, and focus on traditional equitable principles such as prejudice and delay.

On October 7, 1985, the district court found that plaintiffs had not established a right to relief sufficient to enter a default judgment against defendants on plaintiffs' claim for "Intentional Infliction of Emotional Distress" (Eleventh Claim), but the court entered no order regarding that claim, and plaintiffs have not dismissed it. The district court also granted summary judgment against plaintiffs on their claim for "Civil Conspiracy" (Fourteenth Claim), but refused to certify the summary judgment order as final pursuant to Rule 54(b). Thus, these two claims are still "pending" before the district court.

In its order granting Rule 54(b) certification of the libel claim, the district court found that the "unadjudicated claims," presumably including the Eleventh and Fourteenth Claims, and the "adjudicated" (libel) claim were "based upon substantially different factual and legal issues." Order Directing Entry of Judgment, Dec. 18, 1987, C.R. 180 at 2. Plaintiffs agree, arguing that the libel issue is distinct from the other two because it involves the "strictly legal issue regarding proper statutory con-

struction ... of the FSIA." Answering and Reply Brief on Behalf of Appellants, at 21. Defendants argue that the claims present "the same issues." Answering Brief of Cross–Appellees V/O Medexport and V/O Licensintorg, at 41.

Plaintiffs' Eleventh Claim, for Intentional Infliction of Emotional Distress, alleges that by means of, *inter alia*, the alleged libel, the defendants "acted intentionally to inflict severe emotional distress on Mr. Gregorian." First Amended Complaint, C.R. 2 at 22. Plaintiffs' Fourteenth Claim, for "Civil Conspiracy," however, does not explicitly refer to "libel" but simply realleges and incorporates all of the previous paragraphs of the complaint. *Id.* at 24. Nor do the facts alleged in the conspiracy claim overlap substantially with those alleged in the libel claim. The conspiracy claim alleges that defendants conspired to have *CIT's accreditation* terminated. *Id.* at 25. The libel claim, by contrast, alleges that the *Izvestia* article was intended to and did cause *injury to Mr. Gregorian and CIT's reputations. Id.* at 19. Thus, the libel and conspiracy claims are legally and factually distinct.

The interrelationship between the libel claim and the intentional infliction of emotional distress claim, therefore, appears to be the only basis for defendants' contention that the adjudicated and unadjudicated claims are "identical." The interrelationship does not, however, justify a decision that the district court erred in granting the Rule 54(b) certification. The district court could properly conclude that the factual and legal issues involved in the claim for intentional infliction of emotional distress were "substantially different" from those raised by the libel claim. Because the district court properly evaluated the relationship of the claims, we also consider the trial court's assessment of the equities. The district court did not abuse its discretion when it assessed the equities of the Rule 54(b) certification. Accordingly, plaintiffs' appeal of the district court's dismissal of the libel claim is properly before this court.

## B. Libel and the FSIA

Plaintiffs allege that defendants, including *Izvestia*, V/O Medexport, V/O Licensintorg, and the U.S.S.R. "caused to be published false and libelous accusations against Mr. Gregorian, intending to injure him in his personal and business reputation, and to discredit CIT." First Amended Complaint, C.R. 2 at 19. It further alleges that the published charges were "malicious" and "calculated to ... expose plaintiff to hatred, contempt, and ridicule...." *Id.* at 20. Defendants *Izvestia* and the U.S.S.R. are alleged to have "published the article with malice either with knowledge of its falsity or with reckless disregard for whether it was true, motivated by a desire to embarrass plaintiffs and to harm them economically." *Id.* at 21.

On April 5, 1987, the district court granted defendants' motion to set aside the default judgment previously entered on the libel claim. The district court held that its previous judgment was void for lack of subject matter jurisdiction under section 1605 of the FSIA. The court accordingly dismissed the libel claim pursuant to Fed.R. Civ.P. 12(b)(1). 658 F.Supp. at 1234. Plaintiffs now appeal from this portion of the district court's decision.

### 1. The Statutory Scheme

Plaintiffs argue that subject matter jurisdiction over their libel claim is conferred by the "commercial activity" exception to foreign sovereign immunity contained in the FSIA. As the following discussion will demonstrate, plaintiffs' argument rests on a misinterpretation of the FSIA and must be rejected.

The FSIA creates subject matter jurisdiction in certain instances over claims brought against foreign sovereigns by creating statutory exceptions to sovereign immunity. 28 U.S.C. § 1604. Section 1605 provides in relevant part that:

(a) A foreign state shall not be immune from the jurisdiction of the courts of the United States or of the States in any case— ...

(2) in which the action is based upon a commercial activity carried on in the

United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States

.   .   .   .   .

(5) *not otherwise encompassed in paragraph (2) above*, in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment; *except this paragraph shall not apply to —...*

(B) any claim arising out of malicious prosecution, abuse of process, *libel*, slander, misrepresentation, deceit, or interference with contract rights.

28 U.S.C. § 1605(a) (emphasis added).

Section 1605(a)(2)'s "commercial activity" exception to sovereign immunity codifies the so-called "restrictive" theory of foreign sovereign immunity, which permits adjudication of "commercial" claims against foreign states. *See Argentine Republic v. Amerada Hess Shipping Corp.*, — U.S. —, — n. 1, 109 S.Ct. 683, 687 n. 1, 102 L.Ed.2d 818 (1989). In enacting this provision Congress thus rejected the "absolute" theory of sovereign immunity, which grants nations complete immunity from the jurisdiction of foreign courts.

The FSIA defines "commercial activity" as follows:

A "commercial activity" means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.

28 U.S.C. § 1603(d).

Plaintiffs contend that the allegedly libelous *Izvestia* article was published "in con-nection with" a "commercial activity" of the Soviet defendants, and that there is subject matter jurisdiction over the libel claim under all three of section 1605(a)(2)'s clauses. *See* Opening Brief on Behalf of Appellants, at 16–17. The "commercial activity" plaintiffs point to is *Izvestia*'s sale and distribution in this country, and its publication, circulation, and sale outside the United States. *Id.* at 17. They also argue that there is subject matter jurisdiction under the "direct effects" clause of section 1605(a)(2) because they have alleged a financial loss occurring in the United States (contract breaches by CIT's American business contacts) as a result of the Soviet action. *Id.* at 16.

Plaintiffs argue that their libel claim escapes the bar of section 1605(a)(5)(B) because that clause, in their view, only bars jurisdiction of "non-commercial" torts. Their libel claim, they contend, is a "commercial" tort ("trade libel") and therefore can be adjudicated under the "commercial activity" clauses of section 1605(a)(2).

2.  Commercial Activity

We cannot accept plaintiffs' contention that the FSIA provides jurisdiction over the "commercial" or trade libel claim they assert. Under the FSIA, activities are to be characterized according to their nature, not their purpose. 28 U.S.C. § 1603(d). Here, plaintiffs are contending that the alleged libel was published with the *purpose* of injuring plaintiffs by avoiding commercial obligations. In other words, plaintiffs' characterization of the alleged libel as "commercial" rests on "reference to its purpose." *Id.* The *nature* of the *Izvestia* article, by contrast, is clearly governmental. Articles published in *Izvestia* have been characterized as "official commentary of the Soviet government." *Yessenin–Volpin v. Novosti Press Agency*, 443 F.Supp. 849, 856 (S.D.N.Y.1978). "Whether or not the Court admires the tone of such commentary, it cannot be gainsaid that it constitutes 'an activity whose essential nature is public or governmental.'" *Id.* (concluding that TASS and Novosti Press Agency were immune under

FSIA from libel suit based on articles published in *Izvestia* and three other Soviet journals).

We agree with *amicus curiae* United States that *Izvestia* 's "writing and publishing of articles reporting or commenting on events" constitute "sovereign or governmental" activities. Statement of Interest of the United States, at 24. *Izvestia* is the organ of the Soviets of Working People's Deputies, and is published by the Presidium of the Supreme Soviet of the U.S.S.R. According to the United States, "*Izvestia* is the voice of an official Soviet agency, [and] the determination of its contents can be carried out only by a governmental entity; thus, publishing a particular article in *Izvestia* is a sovereign, governmental function." *Id.* The governmental nature of *Izvestia* 's publication and distribution defeats plaintiffs' argument that its sale is sufficient to afford jurisdiction under section 1605(a)(2).[4]

In conclusion, then, we hold that the activity which brought about the publication of the allegedly libelous article in *Izvestia* was governmental rather than commercial in nature for purposes of section 1605(a)(2) of the FSIA. The district court therefore correctly granted defendants' motion to set aside the default judgment, and properly dismissed the libel claim for lack of subject matter jurisdiction.

## II. CONTRACT CLAIMS

In its Order of April 5, 1987, the district court declined to set aside the default judgment on the breach of contract claims. 658 F.Supp. at 1234–39. The court denied defendant's Rule 60(b)(4) motion to set aside the default judgment for lack of jurisdiction. It held that the "direct effect" clause of section 1605(a)(2) of the FSIA provided subject matter jurisdiction over the contract claims. *Id.* at 1234. The district court also determined that V/O Medexport and V/O Licensintorg were not "separate juridical entities" from the U.S.S.R. *Id.* at 1236. It therefore held that contacts between the U.S.S.R., including its missions and Ministry of Foreign Trade, and the U.S. could be attributed to the Soviet trading organizations as the basis for asserting personal jurisdiction over them. *Id.* Finally, the district court held that relief from the default judgment under Rule 60(b)(6) was inappropriate because the Soviet defendants had been "culpable" in not originally appearing to defend the action. *Id.* at 1237–39.

Defendant V/O Medexport[5] appeals from the denial of its Rule 60(b) motions. We hold that the district court erred in denying defendant's Rule 60(b)(6) motion and on that ground we vacate the default judgment and remand this case to the district court for further proceedings. Because we base this result on our resolution of the Rule 60(b)(6) issue, we do not decide whether the FSIA provides personal or subject matter jurisdiction over the contract claims. We remand these latter issues to the district court for further devel-

---

**4.** Plaintiffs' "trade libel" argument was designed to establish jurisdiction under section 1605(a)(2); the trade libel argument does not seek an exception to immunity under section 1605(a)(5). Nor could plaintiffs have established subject matter jurisdiction for their libel claim under section 1605(a)(5). This is because, contrary to plaintiffs' contention, the bar against "libel" claims contained in section 1605(a)(5)(B) must be construed to include claims of "trade libel." As *amicus curiae* United States correctly points out, a contrary interpretation would yield nonsensical results. Statement of Interest of the United States, at 15. For example, foreign sovereign immunity is expressly retained in section 1605(a)(5)(B) for claims of "interference with contract rights" as well as for libel claims. As the United States observes, contract rights cases will almost always involve

commercial activity, and it would have been odd for Congress, without saying so clearly, to have retained immunity for such claims only in the unusual situation in which entirely noncommercial activity was involved. *Id.* at 15–16. We agree that it is far more likely that Congress meant the clauses retaining immunity in section 1605(a)(5)(B) to deny jurisdiction over any claims alleging the torts listed.

**5.** The district court erroneously treated V/O Licensintorg as a "defendant" for purposes of the Rule 60(b)(4) and Rule 60(b)(6) motions. 658 F.Supp. at 1234–39. In fact, V/O Licensintorg was not named as a defendant in any of the breach of contract claims of plaintiffs' complaint. C.R. 2 at 14–17.

opment of the facts in accordance with the guidance provided below.

## A. The Rule 60(b)(6) Motion

Defendant moved under Rule 60(b)(6) to have the district court set aside the default judgment. Subsection (6) of Rule 60(b) allows a court to vacate a judgment "for any other reason justifying relief...." Fed.R. Civ.P. 60(b)(6). The district court denied the motion, ruling that defendant's nonappearance had been "culpable." 658 F.Supp. at 1238–39. Defendant and *amicus curiae* United States argue that the district court abused its discretion in denying the Rule 60(b)(6) motion. We agree.

While a district court has discretion to grant or deny a Rule 60(b) motion to vacate a default judgment, that discretion is limited by three policy considerations. First, since Rule 60(b) is remedial in nature, it must be liberally applied. *Meadows v. Dominican Republic,* 817 F.2d 517, 521 (9th Cir.), *cert. denied,* — U.S. —, 108 S.Ct. 486, 487, 98 L.Ed.2d 485 (1987). Second, default judgments are generally disfavored, and "[w]henever it is reasonably possible, cases should be decided upon their merits." *Pena v. Seguros Comercial, S.A.,* 770 F.2d 811, 814 (9th Cir.1985). Third, where a defendant seeks timely relief from the judgment and has a meritorious defense, doubt, if any, should be resolved in favor of the motion to set aside the judgment. *Meadows,* 817 F.2d at 521.

In this circuit, a district court has discretion to deny a Rule 60(b) motion to vacate a default judgment if (1) the plaintiff would be prejudiced if the judgment is set aside; (2) the defendant has no meritorious defense, or (3) the defendant's culpable conduct led to the default. *Id.*

In the present case, the district court found that "prejudice to plaintiffs from vacating the default judgment would not be significant...." 658 F.Supp. at 1237. It further found that defendants had a "meritorious" defense, because "[i]f the facts that defendants allege are true, they would prevail." *Id.* The court observed that the motion to vacate was made three months after the judgment and thus was

timely at least "in the sense of occurring at an opportune moment." *Id.* The district court however found that defendant's nonappearance in the action prior to the entry of default judgment constituted "culpable conduct" rendering the motion untimely and justifying denial of the Rule 60(b)(6) motion. *Id.* at 1237–39. This finding was incorrect.

We have stated that a defendant's conduct is culpable if he has received actual or constructive notice of the filing of the action and failed to answer. *Meadows v. Dominican Republic,* 817 F.2d 517 (9th Cir.), *cert. denied,* — U.S. —, 108 S.Ct. 486, 487, 98 L.Ed.2d 485 (1987). Defendants do not dispute the fact that they had notice of the action. Their conduct thus appears at first glance to be "culpable." However, this case is distinguishable from those cases in which we have found a party's conduct to be culpable.

### 1. "Culpable Conduct"

■ The district court based its finding that defendants' conduct had been "culpable" on their noncompliance with United States law, namely the FSIA. 658 F.Supp. at 1237–38. The court "[did] not take issue with defendants' continued adherence to their view that under international law the USSR is absolutely immune from suit in foreign courts." *Id.* at 1238. The court stated, however, that while defendants' "adherence to a view that is contrary to law" did not constitute culpable conduct, their "action upon that belief" did. *Id.*

In reaching this conclusion, however, the district court failed to look beyond the broad "view" or "belief" of the Soviet Union regarding foreign sovereign immunity, to the specific reasoning that led to V/O Medexport's refusal to appear before the court prior to the entry of default judgment. According to defendant, its initial refusal to appear was the result of the centrality to plaintiffs' complaint of the "libel" claim. Believing that neither international nor U.S. law provided jurisdiction over libel claims made against foreign states, and also believing that the district court had based its assertion of jurisdiction

over the entire action on an erroneous refusal to accord defendants immunity from the libel claim, the Soviet defendants refused to appear in the action.

*Amicus curiae* United States supports this explanation, and argued to the district court that the Soviet government's "peculiar sensitivity to the charge of libel in the present proceedings" underlay defendant's nonappearance. Statement of Interest of the United States, C.R. 71 at 3. The United States pointed out that while "[p]rivate counsel has appeared in a limited number of commercial and tort cases brought jointly against the Soviet government and its instrumentalities," *id.* at 16, "[t]o our knowledge no Soviet defendant has ever appeared in a libel case where the Soviet Union is among the named defendants." *Id.* at 29.

Plaintiffs believe that this explanation for defendants' nonappearance is irrelevant. Plaintiffs rely on *Meadows v. Dominican Republic*, 817 F.2d 517 (9th Cir.), *cert. denied,* — U.S. ——, 108 S.Ct. 486, 487, 98 L.Ed.2d 485 (1987), for the proposition that we may not reverse a district court's refusal to set aside a default judgment under Rule 60(b)(6) where a foreign defendant had notice of the action and nonetheless failed to appear. In *Meadows,* the plaintiff brought an action in district court for breach of contract against the Dominican Republic ("the Republic") and an affiliated institution. The plaintiff alleged that defendants had failed to pay a commission owed to him for obtaining a loan for the institution. Plaintiff attempted to serve defendants with summons and a copy of the complaint by mail, with return receipt requested. No return receipts were received. Plaintiff then sent a letter to the United States Department of State, as required by 28 U.S.C. section 1608(a)(4), requesting service on the Republic. The Department of State accordingly effected service on the Republic's Foreign Ministry, and gave the Republic detailed warnings of the legal consequences of a failure to respond to the complaint. When defendants did not respond, default judgment was entered against them. Defendants subsequently moved the district court to set

aside the default judgment; the court denied the motion.

On appeal, we affirmed. *Meadows,* 817 F.2d 517. We held that the foreign sovereign defendants' nonappearance had been "culpable" because they had received notice of the action and failed to answer, and because the record failed to support their contention that they had not appeared on the advice of their Undersecretary of Foreign Affairs. *Id.* at 521–22.

This last fact clearly differentiates *Meadows* from the present case. In *Meadows* there was no credible evidence that the foreign sovereign had instructed the defendants to refuse to appear in the proceeding; in fact, the Undersecretary of Foreign Affairs denied responsibility for the decision not to respond. *Id.* In the present case, by contrast, it is undisputed that the Soviet government instructed V/O Medexport not to enter an appearance prior to the entry of the default judgments. *Meadows* therefore does not require that we affirm the district court's holding that V/O Medexport's conduct was "culpable" for purposes of Rule 60(b)(6).

Nor is the present case governed by *Pena v. Seguros La Comercial, S.A.,* 770 F.2d 811, 814 (9th Cir.1985), another case relied on by plaintiffs. In *Pena,* we upheld the district court's refusal to set aside the default judgment entered after defendant, a foreign insurance company, failed to appear in plaintiff's action for tortious breach of insurance contract, on the ground that defendant had not only been properly served with notice of the action under state law, but had also been "culpable" in providing both plaintiff and the state insurance department (through which service was made on defendant pursuant to state law) with an incorrect address. *Id.* at 815. In *Pena,* unlike the present case, defendant did not argue that its nonappearance stemmed from a belief that that it was not subject to suit in a United States court for the claim alleged. The *Pena* defendant's contention rather was that it had not received adequate notice of the action and for that reason had not been obligated to make an appearance. We held that this conten-

tion was without foundation, and in addition held that the defendant had violated its "duty to comply with the laws of [the] state" by failing to keep the state's department of insurance "apprised of its correct address." *Id.* We called this latter failure "culpable conduct." *Id.* Thus the element of culpability in *Pena* was not simply nonappearance following receipt of notice of the action, but rather conduct which hindered judicial proceedings as to which subject matter jurisdiction was unchallenged. Here, by contrast, defendants argued that their government had instructed them not to appear because of the Soviet government's belief that its instrumentalities are immune from suit for libel claims brought in foreign courts. V/O Medexport's nonappearance thus did not represent a flouting of the relevant U.S. law but rather stemmed from its government's belief that it was immune from suit under the FSIA for claims of libel such as plaintiffs'. Our prior decisions interpreting Rule 60(b)(6) do not, therefore, support the district court's conclusion that V/O Medexport's nonappearance constituted "culpable conduct."

The Eleventh Circuit's opinion in *Jackson v. People's Republic of China*, 794 F.2d 1490, 1494–97 (11th Cir.1986), *cert. denied*, 480 U.S. 917, 107 S.Ct. 1371, 94 L.Ed.2d 687 (1987), provides authority counseling against a finding of "culpable conduct" in the present case. In *Jackson*, the Eleventh Circuit affirmed the district court's decision to set aside a default judgment entered against the People's Republic of China ("PRC") in an action for payment of bearer bonds. Plaintiffs, holders of the defaulted bonds, sought jurisdiction over their action under the FSIA. They effected service of process upon the PRC pursuant to 28 U.S.C. section 1608(a)(4). The PRC responded with a diplomatic note to the United States Department of State asserting that it enjoyed absolute sovereign immunity. The district court ordered a default judgment against the PRC after it failed to appear. *Id.* at 1492.

When plaintiffs began efforts to execute on their judgment, the PRC appeared in the case for the first time, filing motions to vacate the judgment under Rule 60(b)(1), (4), and (6), and to dismiss the case. The United States filed Statements of Interest backing the PRC's motions. *Id.* The district court granted the motion to vacate and ordered the case dismissed for lack of subject matter jurisdiction. *Id.*

On appeal, the Eleventh Circuit affirmed the district court's judgments. In particular, the court held that the district court had not abused its discretion in granting the PRC's motion to vacate the default judgment under Rule 60(b)(6). *Id.* at 1494. In so ruling, the court rejected plaintiffs' argument that the PRC was not entitled to equitable relief under Rule 60(b)(6) because the PRC had acted "inequitably" in continuing to insist that as a matter of international law it enjoyed absolute sovereign immunity. The court responded to this argument as follows:

> We reject out of hand the contention that in seeking an adjudication of jurisdictional issues arising out of United States domestic law China acts improperly in reserving what it conceives are its rights under international law.

*Id.* at 1496–97.

We are persuaded by the Eleventh Circuit's reasoning. We therefore hold that where, as here, a foreign sovereign defendant's reasonable belief that it is immune from suit leads it to refuse to appear in an action brought under the FSIA, a court may not characterize this refusal as "culpable conduct" for purposes of a Rule 60(b) motion to set aside a default judgment. Moreover, it is not "culpable conduct" within the meaning of *Meadows* and *Pena* for a foreign sovereign to instruct its corporations or other domestic entities to act in conformity with its own notions of immunity until it has received a definitive indication to the contrary from the United States courts. It follows that the Soviet defendants' reasonable belief that they were not subject to jurisdiction in United States courts with respect to the libel claim, and their reasonable belief that the district court's assertion of jurisdiction over the entire action was based on an erroneous assertion of jurisdiction over the libel claim, undercuts any argument that the

Soviet defendants were "culpable" in not appearing to defend the action. For this reason, we hold that the district court abused its discretion in denying defendant's Rule 60(b)(6) motion to set aside the default judgment.

### 2. "Extraordinary Circumstances"

■ The district court observed that relief under Rule 60(b)(6) is "reserved for 'extraordinary circumstances,' " and that to rule on defendant's Rule 60(b)(6) motion the court therefore had to "determin[e] whether the foreign policy overtones that this case has assumed present the 'extraordinary circumstances' that justify setting aside the judgment." 658 F.Supp. at 1238 (citing *Corex Corp. v. United States*, 638 F.2d 119, 121 (9th Cir.1981)). The court concluded that no such "extraordinary circumstances" existed. *Id.* at 1238–39. Although our holding that defendant had not engaged in "culpable conduct" is the basis for our reversal of the district court's denial of defendant's Rule 60(b)(6) motion, we will briefly address the "extraordinary circumstances" issue.

The district court erred in requiring defendants to demonstrate the existence of "extraordinary circumstances" in addition to satisfying the three-part *Meadows* test, *supra,* in order to obtain relief from the default judgment under Rule 60(b)(6). "Extraordinary circumstances" analysis has in fact been supplanted by the three-part test applied in *Meadows* and *Pena. See Falk v. Allen*, 739 F.2d 461, 463 (9th Cir.1984) (per curiam).[6] Therefore, the district court's determination that the case does not present "extraordinary circumstances" does not support its refusal to set aside the default judgment under Rule 60(b)(6).

### B. The Rule 60(b)(4) Motion

In support of its Rule 60(b)(4)[7] motion defendant argued that the default judgment was void for lack of personal and subject matter jurisdiction. C.R. 79 at 8, 12–16.[8] The district court denied the motion, holding that subject matter jurisdiction over plaintiffs' contract claims was found in the third, or "direct effect," clause of 28 U.S.C. section 1605(a)(2), and that the court had personal jurisdiction over the defendants under 28 U.S.C. section 1330(b). Because we reverse the district court's Rule 60(b)(6) ruling, there is no need for us to decide whether it correctly denied defendants' Rule 60(b)(4) motion. However, on remand the district court may need to address the issues of personal and subject matter jurisdiction under the FSIA; therefore, we will discuss these issues to provide guidance in these potentially difficult areas.

### 1. Subject Matter Jurisdiction under the FSIA

The third, or "direct effect," clause of FSIA section 1605(a)(2) states:

> A foreign state shall not be immune from the jurisdiction of courts of the United States ... in any case—...
>
> > (2) in which the action is based upon ... an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a *direct effect* in the United States.

28 U.S.C. § 1605(a)(2) (emphasis added).

The district court held that subject matter jurisdiction over plaintiffs' contract claims was provided by this clause. 658 F.Supp. at 1234. Defendant argues that

---

**6.** In applying the "extraordinary circumstances" test, the district court relied on our decision in *Corex Corp. v. United States*, 638 F.2d 119, 121 (9th Cir.1981). The *Corex* case, however, represents the approach to default judgments followed by this court prior to our 1984 *Falk* decision.

**7.** Rule 60(b)(4) states: "On motion and upon such terms as are just, the court may relieve a party ... from a final judgment, order, or pro-

ceeding for the following reasons: ... (4) the judgment is void." Fed.R.Civ.P. 60(b)(4).

**8.** Plaintiffs contend that "[t]he Soviet defendant's failure to raise the issue of subject matter jurisdiction below prevents them from raising it for the first time on this appeal." Answering and Reply Brief on Behalf of Appellants, at 2. This is a plain misstatement of the law. *See, e.g., In re U.S. Financial, Inc.*, 594 F.2d 1275, 1282 (9th Cir.1979).

the district erred in finding subject matter jurisdiction under the "direct effect" clause of section 1605(a)(2), and that the denial of its Rule 60(b)(4) motion was therefore improper.

■ A "direct effect" is one that is substantial and forseeable. *Zedan v. Kingdom of Saudi Arabia*, 849 F.2d 1511, 1514 (D.C.Cir.1988). We have construed the "direct effect" clause of section 1605(a)(2) to provide subject matter jurisdiction over breach of contract claims where plaintiffs were U.S. citizens or corporations *and* where the contracts provided for payments to be made in the United States. *Meadows v. Dominican Republic*, 817 F.2d 517, 523 (9th Cir.), *cert. denied,* — U.S. —, 108 S.Ct. 486, 487, 98 L.Ed.2d 485 (1987). *See also Zedan v. Kingdom of Saudi Arabia*, 849 F.2d at 1514–15; *Texas Trading & Milling Corp. v. Federal Republic of Nigeria*, 647 F.2d 300, 312 (2d Cir.1981), *cert. denied,* 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982). However, mere financial loss suffered by a plaintiff in the United States as a result of the action abroad of a foreign state does not constitute a "direct effect" and therefore cannot by itself create subject matter jurisdiction under section 1605(a)(2). *Zedan v. Kingdom of Saudi Arabia*, 849 F.2d at 1515. Thus to establish a "direct effect" in the United States resulting from an act occurring abroad, a plaintiff must establish that "something legally significant actually happened in the U.S." *Id.*

Plaintiffs allege two facts that are relevant to the determination of "direct effect" jurisdiction under section 1605(a)(2) of the FSIA. First, they allege that "defendant [presumably V/O Medexport] visited California in connection with contracts at issue." Answering and Reply Brief on Behalf of Appellants, at 11 n. 1. In support of this assertion, plaintiffs cite their Memorandum of Points and Authorities in Opposition to Motion to Vacate ("Memorandum"). C.R. 86 at 19–22. In that document, plaintiffs assert that contract negotiations regarding various items of medical equipment were conducted by "Soviet defendants when their representatives were in Palo Alto, California...." *Id.* at 20.

Second, plaintiffs assert that the alleged contracts "called for payment to plaintiffs in the United States." Answering and Reply Brief on Behalf of Appellants, at 8 n. 1. The corresponding assertion in their Memorandum states that "[a]ll payments for the transactions which are the basis for the [breach of contract claims] ... were to be made by V/O Medexport to CIT in California." C.R. 86 at 21.

The district court did not mention these alleged facts in its discussion of subject matter jurisdiction. 658 F.Supp. at 1234. The court did not point to any provision of the alleged agreements between V/O Medexport and plaintiffs that created a nexus between defendant's activities and the United States. The court did state that the acts plaintiffs complain of "resulted in the failure of Soviet and American banks to transfer payment from the USSR to plaintiffs in California." *Id.* at 1234.

In *Zedan v. Kingdom of Saudi Arabia*, 849 F.2d 1511, the District of Columbia Circuit stated that to establish subject matter jurisdiction under the FSIA's "direct effect" clause, something "legally significant," such as the incurring of a debt by defendant, must happen in the United States. *Id.* at 1515. The court also suggested that a foreign state's breach of a contractual promise "to make payment [to plaintiff] in the United States" might support subject matter jurisdiction under the "direct effect" clause of the FSIA. *Id.* at 1514.[9]

Plaintiffs have alleged facts which might support subject matter jurisdiction under both of *Zedan*'s factors. However, the

---

9. The *Zedan* court however declined "to reach the question whether a breach of a specific contract to make a payment in the United States, where the commercial activity involved was carried on entirely outside the United States, would be sufficient to cause a direct effect within the meaning of [the "direct effect" clause of 28 U.S.C. section 1605(a)(2) ]...." 849 F.2d at 1515 n. 2. Nor do we decide that question. We simply note the relevance of a contractual provision for payment in the U.S. to the question of subject matter jurisdiction under the FSIA.

"facts" urged by plaintiffs as the basis for subject matter jurisdiction over the contract claims were not pleaded in the plaintiffs' complaint. Instead, plaintiffs first alleged the above-described facts supporting jurisdiction in their Memorandum, which they submitted in January of 1987, two years after first bringing suit. C.R. 86. The Memorandum in turn relies on Gregorian's declaration of November 29, 1986 (the "Palo Alto Declaration"), in which he asserted that in October 1982 in Palo Alto he "gave [V/O Medexport representatives] ... a price quote [for the "Technicon" equipment] and the V/O Medexport representatives accepted." C.R. 86 at 97.

Defendant attacks the 1986 Palo Alto Declaration and suggests that Gregorian manufactured these jurisdictional "facts" at this late date in order to "improve" upon a previous (1985) affidavit that did not aver these same "facts." Opening Brief on Behalf of Appellant V/O Medexport, at 13-15. Defendant contends that "there is no prelitigation confirmation in writing of *any* of the various 'promises' ... ascribed to unspecified representatives of V/O Medexport in ... the Palo Alto declaration." *Id.* at 14-15.

We do not here resolve this dispute over the jurisdictional facts.[10] On remand, the district court should assess the credibility of the evidence offered by the parties and make findings with respect to the factual basis of plaintiffs' assertion of "direct effect" jurisdiction.[11]

### 2. Personal Jurisdiction

■ The district court, in its Order of April 5, 1987, held that it had personal jurisdiction over the "defendants" under 28 U.S.C. § 1330(b) of the FSIA and the "minimum contacts" due process standard of *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). 658 F.Supp. at 1234-36. Under section 1330(b), "[p]ersonal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have [subject matter] jurisdiction under [the FSIA] ... where service has been made under section 1608 of this title." 28 U.S.C. § 1330(b) (1976). This section "grants the district courts personal jurisdiction over foreign states in situations in

---

**10.** The district court based its holding of subject matter jurisdiction not only upon the alleged "contractual disputes between plaintiffs and Soviet defendants," but also upon "the defamatory *Izvestia* article, which was printed in the USSR and circulated in the United States ... [and thus] may be seen as a direct effect of the defendants' acts." 658 F.Supp. at 1234. However, the alleged libel contained in the *Izvestia* article cannot serve as a basis for subject matter jurisdiction over the contract claims because it was not a "direct effect" of defendant's alleged breach of contract; the libel, if it occurred, would have been produced by intervening actions.

**11.** After the district court ruled on the Rule 60(b) motions, this court decided *Meadows v. Dominican Republic,* 817 F.2d 517 (9th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 486, 487, 98 L.Ed.2d 485 (1987). In that case, we affirmed the district court's finding of subject matter jurisdiction under the FSIA because the record showed that the challenged action of the foreign sovereign, the obtaining of a loan commitment, was a "commercial transaction" which caused a "direct effect to occur in the United States." *Id.* at 523. In reaching this conclusion, we articulated the following test for determining jurisdiction under the FSIA:

'[T]he presumption under FSIA is that actions taken by foreign states or their instrumentalities are sovereign acts and thus protected from the exercise of our jurisdiction, unless one of the enumerated exceptions of FSIA applies.'.... Thus, where, as here, the plaintiff alleges in his complaint that his claim is based on a foreign state's strictly commercial acts, the defendant must establish a prima facie case that it is a sovereign state and that the plaintiff's claim arises out of a public act. This proof establishes a presumption that the foreign state is protected by immunity. The plaintiff then has the burden of going forward with the evidence by offering proof that one of the FSIA exemptions applies. Once the plaintiff has presented this evidence, the defendant must prove its entitlement to immunity by a preponderance of the evidence.

*Id.* at 522-23. We distilled this test from the House Report containing the legislative history of the FSIA. *Id.* at 522 (quoting from H.R.Rep. No. 1487, 94th Cong., 2d Sess., *reprinted in* 1976 Code Cong. & Ad.News 6604, 6616).

Because *Meadows* is now the law of this circuit, the district court should apply that case's test if the court decides the issue of subject matter jurisdiction on remand.

which those states are not entitled to sovereign immunity, as determined in [FSIA] §§ 1605–1607, and when service has been made pursuant to § 1608." *Thos. P. Gonzalez Corp. v. Consejo Nactional de Produccion de Costa Rica,* 614 F.2d 1247, 1254 (9th Cir.1980).[12] Thus if defendants are entitled to immunity under the FSIA, there can be no personal jurisdiction over them. However, if defendants are *not* entitled to immunity under the FSIA, a court must consider whether the constitutional constraints of the Due Process clause preclude the assertion of personal jurisdiction over them. "Personal jurisdiction under the [FSIA] requires satisfaction of the traditional minimum contacts standard." *Id.* at 1255.

In order to analyze the relevant contacts, the court must first ask: "whose contacts, and with what?" *Texas Trading v. Federal Republic of Nigeria,* 647 F.2d 300, 314 (2d Cir.1981), *cert. denied,* 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982).

### (a) Whose Contacts?

#### (i) V/O Licensintorg

The district court erred in considering the "contacts" of defendant V/O Licensintorg. *See* 658 F.Supp. at 1234–36. In its Order of June 25, 1986, the district court entered default judgment only on Claims 5 through 8 (the "contract claims") and the libel claim (Claim 10). C.R. 44 at 1. V/O Licensintorg is not named as a defendant in Claims 5 through 8. *See* First Amended Complaint, C.R. 2 at 14–18. Thus to the extent that the district court "counted" V/O Licensintorg's contacts in determining that it had personal jurisdiction over defendant V/O Medexport with respect to the contract claims, it was in error.

#### (ii) "Separate Juridical Entity"

In its order denying the Rule 60(b)(4) motion to vacate the default judgment, the district court considered, as "contacts" of V/O Medexport, the activities of the Soviet Embassy in Washington, D.C. and the Soviet Consulate in San Francisco. As a result, it found sufficient contacts between V/O Medexport (and V/O Licensintorg) and the United States to justify assertion of personal jurisdiction. 658 F.Supp. at 1236. The court stated that it "views defendant trade organizations, both generally and specifically with regard to this action, as integral parts of that [Soviet] State which enjoys representation through diplomatic and trade missions around the world." *Id.* The court therefore attributed all of the U.S.S.R.'s diplomatic and trade contacts in the United States to V/O Medexport.

The district court also attributed the "payment activities of BankAmerica, Chase Manhatten Bank, and the Bank of Foreign Trade in New York and California ... to defendants." *Id.* at 1235. The court asserted that "[i]f these banks had not at various times performed for defendants, the entire payment mechanism supporting the relationship between plaintiffs and defendants would have ceased to exist." *Id.*

Lastly, the district court took note of the Certificate of Accreditation issued by the U.S.S.R. to CIT. This Certificate stated that while CIT could deal with Soviet organizations "concerning questions of buying and selling, [CIT must operate] only through the Ministry of Foreign Trade." 658 F.Supp. at 1235. The court concluded that V/O Medexport was either an "agent[ ] or alter ego[ ] of the Ministry," *id.,* and thus not entitled to separate juridical status. *Id.* at 1236.

On the basis of the activities of the Soviet trade and diplomatic missions in the U.S., the banks enumerated above, and the supposed agency relationship between V/O Medexport and the Soviet Ministry of Foreign Trade, the court concluded that personal jurisdiction over defendants was appropriate. *Id.*

Defendant and the United States argue that, on the contrary, V/O Medexport has a "separate juridical existence" from the Soviet State, and that for purposes of personal jurisdiction only V/O Medexport's "contacts" are relevant. Opening Brief on Behalf of Appellant V/O Medexport, at 30–32;

12. Defendant does not dispute the validity of the service of process made on it.

Statement of Interest of the United States, at 32–35. They point to the Supreme Court's statement, in *First National City Bank v. Banco Para El Comercio Exterior de Cuba* (*Bancec* ), 462 U.S. 611, 626–27, 103 S.Ct. 2591, 2599–2600, 77 L.Ed.2d 46 (1983), that "[d]ue respect for the actions taken by foreign sovereigns and for principles of comity between nations ... leads us to conclude ... that governmental instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such." The Court found that FSIA embodied a "presumption of independent status" for "duly created instrumentalities of a foreign state." *Id.* at 627, 103 S.Ct. at 2600.

V/O Medexport argues that the Certificate of Accreditation's directive that CIT operate through the Ministry of Foreign Trade is merely an "administrative requirement" that is irrelevant to the determination of separate juridical existence. Opening Brief on Behalf of Appellant V/O Medexport, at 32. Defendant also offered the testimony of a Soviet lawyer that Soviet trading organizations have separate juridical existence under Soviet law. C.R. 121 at ¶ 5.

The district court admitted that Soviet law may in fact "confer[ ] juridical separateness upon Soviet trading organizations," *id.* at 1235, but it chose to look instead at what it called "the essential realities of the organizations' existence" in declining to recognize the juridical separateness of V/O Medexport. *Id.* The court thus disregarded the guidance of *Bancec* by refusing to accord the presumption of independent status to a duly created instrumentality. We do not believe that plaintiffs have rebutted the presumption of V/O Medexport's separate juridical existence. Therefore, on remand the district court should not count as contacts of V/O Me-

dexport the activities of the Soviet Ministry of Foreign Trade, the Soviet Embassy, the Soviet Consulate, BankAmerica, Chase Manhattan Bank, or the Bank for Foreign Trade. The district court should consider only V/O Medexport's contacts with the U.S. in determining whether assertion of personal jurisdiction over V/O Medexport satisfies the requirements of due process.

### (b) Contacts with What?

The district court "aggregated" all of defendants' contacts with the entire United States, rather than looking only to contacts with the forum state (California). The court relied on the Second Circuit's opinion in *Texas Trading & Milling Corp. v. Federal Republic of Nigeria,* 647 F.2d 300 (2d Cir.1981), *cert. denied,* 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982), in which the court, addressing the issue of personal jurisdiction under the FSIA, stated:

> Since service [on Nigeria and its Central Bank] was made under [28 U.S.C.] § 1608, the relevant area in delineating contacts is the entire United States, not merely New York [the forum state].

*Id.* at 314. The Ninth Circuit has adopted the *Texas Trading* approach to determining relevant contacts. *See Meadows v. Dominican Republic,* 817 F.2d 517, 523 (9th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 486, 487, 98 L.Ed.2d 485 (1987) (citing *Meadows v. Dominican Republic,* 628 F.Supp. 599, 605–08 (N.D.Cal.1986)). Thus the district court properly "aggregated" all contacts with the United States rather than only considering those contacts with California.[13]

AFFIRMED IN PART, and REVERSED and REMANDED IN PART.

The parties shall bear their own costs.

---

**13.** It should be noted however that the Supreme Court has declined to rule on the constitutionality of "aggregation of contacts" theory. In an opinion not cited in *Meadows,* Justice O'Connor wrote:

> We have no occasion here to determine whether Congress could, consistent with the Due Process Clause of the Fifth Amendment,

authorize federal court personal jurisdiction over alien defendants based on the aggregate of *national* contacts, rather than on the contacts between the defendant and the state in which the federal court sits.

*Asahi Metal Ind. v. Superior Court,* 480 U.S. 102, 107 S.Ct. 1026, 1033 n. **, 94 L.Ed.2d 92 (1987) (plurality portion of opinion).